**RUTLEY v. HONOR & CO.**

---

(October 3, 1927. Opinion and Decree.)
(October 31, 1927. Rehearing Refused.)

---

(*Syllabus by the Court*)

1. **Louisiana Digest—Master and Servant— Par. 154, 160 j:**

Every plaintiff suing his employer under the Employers' Liability Act, No. 20 of 1914, as amended, must prove, as a condition precedent to recovery, that the injury he complains of was caused by an accident and not by other causes.

(The recent Amendment of Act 20 of 1914 is Act 85 of 1926.—Editor's note.)

Appeal from Civil District Court. Hon. Wm. H. Byrnes, Jr., Judge.

Action by Peter Rutley against J. B. Honor & Co.

There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

Feitel & Feitel, N. H. Polmer, of New Orleans, attorneys for plaintiffs, appellee.

Lemle, Moreno & Lemle, of New Orleans, attorneys for defendant, appellant.

CLAIBORNE, J. This is a suit by a longshoreman under the Employers' Liability Act.

The plaintiff alleged that he was employed by the defendants to work upon a wharf handling creosote cross ties; that his duties consisted in binding together a number of cross ties and placing a chain around them to load them upon a ship; that his occupation was hazardous; that on June 29th, 1926, while he was assembling and stacking cross ties the chain which bound the ties together broke and caused a piece of creosoted timber to strike him upon the head, spilling creosote upon his body, and into his left eye; that his eye was burnt, causing him to lose the complete sight of said eye; that as a consequence he has been unable to do work of any character; that prior to the accident he was earning $45 a week; that on July 13th, 1926, the Employer's Casualty Co., on behalf of the defendants, tendered him $15 for the week ending July 13th, 1926, which he refused, believing that he was entitled to more; that he is entitled to .65 per cent of $45 for a period of 100 weeks; that he was so weakened for a period of nine weeks following the accident that he was unable to do any work and that he is entitled to an additional compensation of 65 per cent on $45 per week for nine weeks; that he has been under the constant care of eye specialists since the accident, and will need spectacles for which he is entitled to an additional $250.

For answer, the defendants admitted that they had employed the plaintiff for handling cross ties, as alleged by him; and that the Employers' Casualty Co. had tendered plaintiff $15, as alleged, which was as much as he was entitled to. They denied all the other allegations, which may be summarized as follows:

1st. That plaintiff's occupation was hazardous.

2nd. The accident and its consequences.

3rd. That plaintiff was unable to do any work of any kind.

4th. That he had been earning $45 per week prior to the accident.

5th. That he is entitled to an additional $45 for nine weeks.

6th. That they owe medical services more than they have already furnished.

There was judgment in favor of plaintiff for $20 a week for sixteen weeks and three days, commencing June 29th, 1926, and for $150 for medical services.

The defendants have appealed, and plaintiff joined in the appeal.

Taking up the defenses seriatim:

I. Section 2 of Act 20 of 1914 classes among the hazardous occupations:

"The operation of vessels * * * loading the cargoes of vessels."

If not defendants, at least defendants' insurers, conceded that the employment was hazardous by tendering $15 compensation.

Summers vs. Woodward Wight &amp; Co., 142 La. 241, 76 South. 674.
Johnson vs. Vernon Parish Lbr. Co., 151 La. 663, 92 South. 219.

II. The accident is established.

The plaintiff thus describes it:

"Q. What happened to you?
"A. The cross tie fell from the load and knocked a piece of creosote and it knocked me on the forehead.
"Q. Peter, did anything else happen to you?
"A. Creosote got in my eye and face and all over my arm.
"Q. What did the creosote do to your eye?
"A. Burned my eyes, and put out my left eye and skinned all the skin around the left eye and face.

"Q. What was the condition of your eye on the day it got burnt, that you got creosote in it?
"A. It was in bad condition; I couldn't hardly see anything when I left the wharf; looked like I had the blind staggers; couldn't see.
"Q. What color was it?
"A. When I looked in the glass at Dr. Philips' my eye was red and looked like it was burnt out with creosote.
"Q. And it peeled the skin out, on the outside of the eye?
"A. Yes, sir; on the left side * * * it peeled a place off my cheek; here on the right side.
"Q. Are you sure of that?
"A. Yes, sir. It peeled my face in two or three different places.
"Q. When you went to see Dr. Brown, was your eye better or worse than when you went to see Dr. Philips?
"A. It couldn't be no better, from the time I went to see Dr. Philips to the time I went to Dr. Brown, because it was hurting me the same.
"Q. What time of day did you get hurt?
"A. About 10 o'clock.
"Q. What time of day did you see Dr. Philips?
"A. Something after 12.
"Q. You saw him some time after 12 and saw Dr. Brown about 25 minutes after that?
"A. Yes, sir.
"Q. You say these cross ties had just come out of the creosote mill?
"A. Yes, sir; they had just hauled them on the wharf.
"Q. They were wet and drippy?
"A. Yes, sir. When the sun shines on them they get soft, you know, really soft.
"Q. What was the condition of your arms?
"A. My arms peeled. I showed Dr. Brown. Peeled from here to the wrist." (He never suffered from his eye before.)

The cut on the forehead was cured in about two weeks; but for that he could have gone back to work after two weeks.

E. C. Matthews, in the accident insurance business, insured plaintiff; saw him at his house a few days after the accident; his eye was burnt, also his hand, and his forehead; one eye was very red and in-

flamed, does not know which eye. He paid plaintiff $7 a week on the certificate of Dr. E. M. Brown for burns by creosote; he had a bandage on his forehead and on his eye.

W. E. Smith is a train porter, also an accident insurance agent; he insured plaintiff and paid him on Dr. Brown's certificate; he saw plaintiff the evening of the accident; he had a plaster on his forehead and his eyes were running water, red and burnt, and all his arms were burnt; the skin peeled off; he has brand new skin there and also on his face; both of plaintiff's eyes were red and running water for a week or more.

Sidney Peyton runs a grocery near plaintiff's home; saw plaintiff's eyes the day after the accident; they were red and dark all around the face; the next two or three days after the arms began to peel; plaintiff came around his club practically all the time when he didn't do anything; both eyes were very red; and dark around there; plaintiff always paid his bills.

Eugene Scott, laborer on levee, lives one block from plaintiff; saw him the night of the accident; his eyes were red, both eyes; his face and arm were burnt; he was crying, water was running from his eyes; he earns an average of $25 a week.

Dr. H. N. Blum, for plaintiff, testified that plaintiff's left eye is near-sighted; his condition is one which suggests corneal dystrophy; such types are found in old people and in people whose eyes are blind by other diseases; there are lots of people with only one eye who don't know it.

"Q. You don't know whether there was a burn as a matter of fact?
"A. I don't know anything about it."

Dr. Park Howell, for plaintiff, testified:

He saw the plaintiff only one month after his accident; he noted a superficial opacity of the cornea of his left eye; he also noted that eye was myopic; he was able to see about 20-100; he is not blind; creosote in that eye would affect it as it would any other eye; if he had not been informed that the eye had been injured by creosote he would not have been able to determine that it was due to a burn; there was absolutely no symptoms present by which he could say that the condition of the eye was brought about by a burn; a burn by creosote would cause the eye to be red, swollen, tearing, and the eye more or less tightly closed and spasmodic; the cause of dystrophy is not known; it might be caused by a burn; he saw plaintiff about 20 days after the accident.

"Q. Are you prepared to swear that this condition of Peter Rutley's eye was due to an accident, and could not have been due to natural causes?
"A. Absolutely not.
"Q. You do know there were traces of burns in Peter's eyes; whether causd by creosote, you don't know?
"A. No, I couldn't say that, that it was burned; nobody could say positively. They might have an opinion. But there were opacities which might have been caused by burns."

On behalf of the defendant, the following witnesses were examined:

Dr. M. Earle Brown testified:

According to his office record, plaintiff, aged 31, entered his office on June 29th, 1926; he had a gauze one inch long and ¼ inch wide struck over his forehead with a piece of adhesive plaster to cover a skin wound; plaintiff told the details of the accident and said that the blood ran down his face and he placed both hands to his eyes, creosote entering them in this manner; both eyes were quiet; there was no evidence of inflammation; vision in the right eye was normal; in the left eye the patient was able to count his fingers three

feet from his left eye; the left eye showed an opacity resembling dystrophy; the eye was highly myopic; the diagnosis was zonular opacity of the left cornea (dystrophy) compound myopic astigmatism; this condition was due to a disease of the eye and not to an accident; there were none of the symptoms of an eye burnt by creosote.

"Q. Are you willing to swear that that man received no injury and got no creosote in his eye on that day?

"A. I am willing to swear that I do not believe that he got creosote in his eye on that day, none at all."

He "did not find any evidence of injury and that eye didn't look like it was injured"; he didn't think the eye had any creosote in it; he does not believe that the present condition of plaintiff's eye could be produced by creosote entering his eye; at the time he saw the plaintiff there was no evidence of any burns from creosote on his face either the skin around his eyes or elsewhere around the face.

A. R. Evans, bookkeeper for defendants, testified that longshoremen earn an average of $15 or $20 a week.

Dr. Z. T. Young, witness for defendant, testified that he had been employed by plaintiff's attorneys to examine plaintiff's eyes; that he examined them and gave the attorneys a written report; he saw the plaintiff on July 26th and 27th; he said: "My diagnosis in this case, or rather in my opinion, the diagnosis was corneal dystrophy; specifically speaking, zonular opacity of the cornea in a near-sighted eye with choro-retinial atrophy chronic"; it did not look to him like a recent condition; he knows of no instance where a burn caused myopia; his opinion is that the condition of plaintiff's eye existed before any creosote got into it.

Dr. W. R. Buffington, for defendant, visiting eye surgeon of the senses hospital, professor of eye diseases at Tulane University, holds clinics at Charity Hospital for Tulane students three times a week; sees 60 to 100 cases each time; examined plaintiff on July 15th and 16th at request of Dr. Brown; plaintiff gave him his history of the case; witness found no evidences of inflammation of the left eye; found plaintiff to have a highly myopic or near-sighted eye, astigmatism eye; this condition had existed long before the accident; an eye showing so much opacity resulting from an injury to the cornea where all inflammation symptoms shall have passed away at the end of two weeks is inconceivable; in the process of repair those symptoms could not possibly disappear in two weeks; it will take ten days or two weeks for the peeling off of the corneal epithelium or covering of the eye to peel off or separate from the healthy tissue; it cannot get stationary in two weeks, a man may have a bad eye without knowing it, and accidentally discover it; it would have been "a physical, or probably better a physiological, impossibility, if plaintiff's eye had been burnt with creosote, for the condition of his eye when he saw it to have existed, for the inflammatory symptoms to have disappeared, and for the conditions to have assumed a status that we call old, that is stationary; there was a burn, we will say, of the cornea; the burn destroyed tissue; now it would take, that is just physiologically, a number of days for that burnt tissue to separate from the healthy tissue; now after that is done, peeled out, the reparative process has to go on; and in as extensive an injury as this is the reparative process would take many weeks to restore it to a stationary status"; the insurance company paid him for this consultation.

Dr. J. R. Hume, for defendant, testified that he had his office in the same suite as Dr. Brown; Dr. Brown requested him

and Dr. Grandberry to look at plaintiff to see the eye, to see if we could determine if there was any inflammation present. There was not.

It was admitted that if Dr. Carl Grandberry was present he would corroborate Dr. Hume as to the condition of plaintiff's eye.

Dr. M. Earle Brown on the first visit of plaintiff to him had given him four certificates of eye burn with creosote with which plaintiff obtained reliefs from his insurance companies. Dr. Brown explains that those certificates were given on the faith of statements made to him by plaintiff and as a result of tentative diagnosis of the case prior to his own investigation, as is the custom in the profession.

After the trial of the case the court appointed Dr. J. Brown Le Rose, expert, to examine the plaintiff and the record, and to make a report of the result of his investigation. In that report the doctor says in part:

"The optic disc seemed excavated as in glaucoma, with a myopic crescent or conus to the temporal side * * * . To revert to the corneal pathology and avoiding details, the changes there found were typical of those of a zonular distrophy. * * *
"This patient presents a case of high myopic astigmatism and also a glaucoma, as previously stated. Whether or not a small amount of creosote entered the eye, I am not at this date able to determine. There are no evidences of such a burn at this time, but only those of a definite clinical entity known as Zonular Keratitis or Dystrophy * * * . In my opinion, it would be highly improbable that a burn of the cornea should simulate in its remaining opacity such a definite change as evidenced by a Zonular Dystrophy found in a diseased eye, as is markedly present in the case of Peter Rutley."

Dr. Wm. D. Philips remembers nothing of the plaintiff or of his case, but he has his office record, which is as follows:

"Injured June 29th, 1926. Struck on head by piece of wood while unloading truck on wharf; contusion and laceration of forehead. Serum given. Referred to Dr. Brown. Two weeks (July 13th). Discharged July 13th, 1926. To return to work July 14th, 1926."

We have thus reproduced a part of the testimony which satisfies us that not only plaintiff has not made it reasonably certain that the infirmity of his eye is due to the accident or to creosote in his eye, but, in the language of the trial judge in his reasons for judgment, "that the vast preponderance of evidence in this case negatives the fact that the condition of plaintiff's eye is a result of the accident". There is no necessity of discussing the testimony; it speaks for itself.

Maynard vs. Red River Oil Co., 162 La. 1, 110 South. 68.
Orange National Bank vs. Southern Pac., 162 La. 223, 110 South. 329.
Toca vs. Rojas, 152 La. 317, 93 South. 108.

But what has been made certain is that plaintiff was struck on the forehead while performing services incidental to, and in the course of, his employment, and suffered injuries which incapacitated him from work, as he says himself, for the period of two weeks, and that he consulted physicians as a consequence of those injuries. The testimony of the plaintiff is that he earned an average of $45 per week; that of the defendant is that the average earnings of plaintiffs' class is $25 a week.

We will adopt the mean between the two and under Section 8 of Act 43 of 1922 grant the plaintiff sixty per cent of $35 during two weeks or $42 compensation. After the healing of the wound in the forehead there was nothing to prevent the plaintiff from going back to work. He states so himself. Neither his eye, nor his vision was affected by any creosote if any got to his eye.

. His eye fifteen days after the accident was as good, or as bad, as it had been before the accident. There was nothing then in the condition of his eye which did not exist before the accident and there is nothing to show that he could not have returned to work fifteen days after as he had worked before. If he did not work, being able to do so, he had only himself to blame; and if he worked he certainly cannot claim compensation.

But we are of the opinion, with the trial judge, that plaintiff is entitled to compensation for doctor's fees for ascertaining that the creosote was not the cause of the infirmity of his eye.

It is, therefore, ordered that the judgment herein be amended by reducing the amount allowed the plaintiff from twenty dollars per week for a period of sixteen weeks and three days to twenty-one dollars per week for a period of two weeks commencing June 29th, 1926, and as thus amended that the judgment be affirmed, the defendants to pay the costs in both courts.

Judgment amended and affirmed.